IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MARCUS RODGERS, | ) |
| | ) |
| Petitioner | ) Case No. 1:19-cv-000207 (Erie) |
| | ) |
| vs. | ) |
| | ) MEMORANDUM OPINION AND |
| BRADLEY TRATE, WARDEN, | ) ORDER ON PETITION FOR |
| UNITED STATES PAROLE | ) WRIT OF HABEAS CORPUS |
| COMMISSION, | ) |
| | ) (ECF No. 1) |
| Respondents | ) |
| | ) |

RICHARD A. LANZILLO, United States Magistrate Judge.

I.      Introduction

Marcus Rodgers (Rodgers), an inmate in the custody of the Federal Bureau of Prisons, has

filed a Petition for Writ of Habeas Corpus under 28 U.S.C. § 2241. ECF No. 1. In April of 1997,

Rodgers pleaded guilty to a charge of second-degree murder in the District of Columbia. He was

sentenced to a term of twenty years to life imprisonment. After being initially granted parole by the

United States Parole Commission (the Commission), Rodgers was re-incarcerated following the

Commission's reconsideration of its decision based on testimony from the victim's mother. His

petition claims he is being unconstitutionally detained and is entitled to immediate release.

The Court will grant the petition.[1]

II.     Factual Background

The factual background is taken from the representations contained in Rodgers' petition.

*See, e.g., Scott v. Ebberts*, 2010 WL 391814, *1 (M.D. Pa. Jan. 11, 2010). Where able, the Court will cite

directly to undisputed evidence of record.

---

[1] The Parties consented to the jurisdiction of a United States Magistrate Judge to conduct all proceedings in this case, pursuant to 28 U.S.C. § 636(c), including entry of final judgment. *See* ECF No. 2; ECF No. 26.

Rodgers pleaded guilty in the District of Columbia to the second-degree murder of Christian McNeil, in violation of District of Columbia Code § 22-2404 (currently § 22-2103). At the time of the offense, Rodgers was eighteen years of age. He has been incarcerated primarily at the Federal Correctional Institution at McKean (FCI-McKean) since 2008.

Rodgers first became eligible for parole on March 8, 2016. In anticipation of this date, the Commission held an initial parole hearing for Rodgers on October 5, 2015. At this hearing, Hearing Examiner Sandra Hylton found that Rodgers "accepted responsibility for the offense behavior" and "apologized to the victim's mother, stating he makes no excuses for what he did." *See* ECF No. 1-3, p. 2. The Hearing Examiner noted that Rodgers "indicated his remorse for this offense to the victim, which this Examiner believes was sincere." *Id.* at p. 4. Gwendolyn McNeil, the victim's mother, also provided written and oral testimony at the hearing. Using the District of Columbia's Parole Guidelines, Rodgers was given a score of 2, which indicated parole should be granted. However, the Hearing Examiner deviated from the guidelines and recommended Rodgers be denied parole to allow him time to finish his General Education Degree (GED). *Id.* The Commission adopted the Hearing Examiner's recommendation and denied Rodgers parole on December 7, 2015. ECF No. 1-5, p. 2. The matter was continued for rehearing in twenty-four months. *Id.* at p. 3.

A second parole hearing took place on October 10, 2017, before a different Hearing Examiner, Stephen Husk. The victim's mother was notified of the hearing in accordance with the Crime Victim's Rights Act (CVRA), 18 U.S.C. § 3771, *et seq.*[2] In his post-hearing assessment report, the Hearing Examiner noted that a "pre-Hearing Examiner emailed [Commission] Victim Staff a copy of the pre-hearing assessment including the information pertaining to the victim's mother prior

---

[2] The CVRA provides victims, among other things, with the "right to be reasonably heard at any public proceeding in the district court involving release, plea, sentencing, or any parole proceeding." 18 U.S.C. § 3771(a)(4). This right to be heard, however, "does not give the victims of crime veto power over any prosecutorial decision, strategy or tactic regarding bail, release, plea, sentencing or parole." *United States v. Rubin*, 558 F. Supp. 2d. 411, 424 (E.D.N.Y. 2008) (citing *In re W.R. Huff Asset Management Co., LLC*, 409 F.3d 555, 564 (2d Cir. 2005)).

participation." ECF No. 1-6, p. 2. The Commission did not receive a response from Ms. McNeil and the Hearing Examiner "checked back with [Commission] Victim Staff on 10/6/17 and no response had been received." *Id.*

At this second hearing, Rodgers again admitted his offense and offered no excuse for his actions. *Id.* at 3. Rodgers acknowledged that the murder involved a "disagreement over drugs" and that he was "young and impulsive." *Id.* Rodgers told the Hearing Examiner that "he wishes that he made better choices and could bring the victim back." *Id.* Hearing Examiner Husk further noted that the Commission's "primary basis for the [first] parole denial was his failure to obtain his GED." *Id.* When questioned about his continued failure to earn his GED, Rodgers told the Hearing Examiner that "his only problem is mathematics which has plagued him for all his life. It was noted that he still attends GED courses from Monday through Friday from 12 Noon to 2 p.m." *Id.*

Hearing Examiner Husk also referenced the testimony of the victim's mother from the 2015 hearing. He stated on the record that "we don't have ... as I said, we don't have the victim's mother here this time. I don't know that she feels any differently." ECF No. 1-11 (audio file of 2017 parole hearing). The Hearing Examiner's post-hearing assessment also noted the absence of the victim's mother at the hearing and referenced her statement from Rodgers' 2015 parole hearing wherein she "opposed parole, reading into the record, outlining her opposition to release" and relating her son's last moments. ECF No. 1-6, p. 2. The Hearing Examiner also found Rodgers' explanation for not completing his GED to be credible, and noted documentation which supported Rodgers' good faith attempts to do so. *Id.* at 5. Rodgers' satisfactory completion of a six-month drug treatment program was also noted by the Hearing Examiner. *Id.* at 4. Hearing Examiner Husk further observed that Rodgers has been free of disciplinary conduct for over fourteen years. *Id.* at 5. Given all of this, the Hearing Examiner recommended Rodgers be granted parole. *Id.* at 4-5.

3

The Commission adopted the Hearing Examiner's recommendation on November 6, 2017, and set July 23, 2018, as Rodgers' effective parole date. *Id.* at 6. The vote for granting parole was 2 to 1. Commissioners Smoot and Cushwa voted in favor of parole and Commissioner Massarone voted against. ECF No. 1-6 at 6; ECF No. 1-21 at 2.

On March 21, 2018, Rodgers was transferred from FCI-McKean to a residential reentry center called Hope Village Halfway House, located in Washington, D.C. While there, Rodgers was housed with three other individuals, participated in drug counseling, took a computer programing course, and continued working toward completion of his GED. He was later permitted to search for employment. He passed a construction exam and obtained a $13.00 per hour position in the District of Columbia as a construction worker. Although the record is not entirely clear, Rodgers began working sometime in mid-May of 2018.[3] What is clear, however, is that between March 21, 2018 and May of 2018, Rodgers had an unblemished record while at the halfway house. Rodgers ended up only working one day at this job, completing a 4:00 AM to 3:00 PM shift. Upon returning to the halfway house that day, at approximately 8:30 PM, Rodgers was arrested and transferred to a regional jail in Virginia. He was not told the reason for his arrest. He was transferred back to FCI-McKean a few days later.

Unbeknownst to Rodgers, two days after the Commission voted in favor of his parole, Ms. McNeil contacted a victim specialist at the Commission. She confirmed that she received the notification of Rodgers' October 10, 2017 parole hearing but was unable to attend. Subsequently, she wrote to the Commission on November 13, 2017, and reiterated her opposition to Rodgers' parole. A Supervisory Victims Coordinator, Najah A. Barton, followed-up by telephone with Ms. McNeil. Ms. McNeil expressed "concerns relating to the nature of the case" to Barton. The victim's mother stated that she "is concerned for her safety—as the nature of where the offense

---

[3] Rodgers himself has stated that he was at the halfway house for "1 ½ months," beginning in March 21, 2018.

4

occurred, the manner in which the subject spoke to her at the 2015 hearing, and the fact of the type of bullets used in the offense, are concerning—as she is elderly." ECF No. 1-7, p. 2. Ms. McNeil admitted, however, that there has been no communication between herself and Rodgers, but expressed concerned he could use the Internet to find her. *Id.* Ms. McNeil requested another parole rehearing so that she could appear and offer further testimony. *Id.* Barton recommended that the Commission "[c]onduct a re-hearing at the next soonest available docket before the parole effective date … as [Ms. McNeil's] typed-written statement of November 13, 2017, could not be considered before or during the hearing process and [Rodgers] presently has a presumptive parole date." *Id.*

The Commission adopted Barton's recommendation on April 23, 2018, stating "the following action was ordered pursuant to [28 C.F.R. § 2.28(f): Reopen and reschedule for a special reconsideration hearing on the next available docket." The Commission cited Ms. McNeil's unavailability "to exercise her right to participate in the parole hearing associated with the subject-named offender under D.C. Code and the Crime Victims' Rights Act." *See* ECF No. 1-10, p. 2. A special reconsideration hearing was then held before Hearing Examiner Husk on June 4, 2018. The Hearing Examiner defined the purpose of this hearing:

> The primary purpose of this hearing is really for the victim participation, but I am going to have some questions for you myself … There isn't any new information. I've basically stated why we are doing this hearing—because the victim contacted the Parole Commission after your hearing.

ECF No. 1-14. In summarizing the reconsideration hearing, the Hearing Examiner noted that "the Commission ordered that [Rodgers] be paroled effective 7/23/2018. However that parole grant was pulled back after the deceased victim's mother contacted the USPC and advised of her intent to exercise her right to testify at the hearing. Thus, today's hearing was a special reconsideration hearing for that purpose." ECF No. 1-9, p. 2. At the reconsideration hearing, Ms. McNeil read a letter dated May 29, 2018 into the record. ECF No. 1-22.

5

Rodgers also spoke at the reconsideration hearing. He told the Hearing Examiner that he had satisfied his obligations regarding counseling, was continuing to complete his GED, and had found a job working construction. ECF No. 1-9, p. 3. The Hearing Examiner noted Roger's disappointment on being re-incarcerated, but also noted his desire to make amends to the victim's family by becoming a productive citizen. *Id.* Rodgers again apologized to the victim's mother. *Id.*

Upon conclusion of this rehearing, the Hearing Examiner again recommended that Rodgers be granted parole. *Id.* at 4. The Hearing Examiner balanced the "strong and very impactful statement" of the victim's mother against Rodgers' young age at the time of the offence, his lack of a prior criminal record, that Rodgers did not randomly target the victim, and that he has maintained a clear prison conduct record since 2003. *Id.* The Hearing Examiner additionally observed that Rodgers has remained in custody more than two years beyond his parole eligibility. *Id.* Weighing these factors, the Hearing Examiner recommend that Rodgers be re-paroled. *Id.*

Despite this recommendation, the Commission voted not to grant Rodgers parole. This time, Commissioner Cushwa joined Commissioner Massarone in voting to deny. ECF No. 1-23, p. 2. Commissioner Massarone filed a memorandum on June 7, 2018, and noted that his reasons for voting to deny parole were the same as those he stated in October of 2017. ECF No. 22-13. Then, on June 14, 2018, the Commission memorialized its decision stating that although the parole guidelines indicated that parole should be granted, it deviated from those guidelines "due to the nature of the violation, the aggravating circumstances and your actions while in the community, your institutional experience such as your lack of success towards your educational development and

victim's impact programming."[4]  ECF No. 1-13. Rodgers' effective parole date has now passed, and he remains in the custody of the Federal Bureau of Prisons.[5]

III.    Procedural History

About two and a half weeks after his parole date passed, the Washington D.C. Lawyer's Committee for Civil Rights and Urban Affairs (Lawyer's Committee) sent a Freedom of Information Act (FOIA) request on Rodgers' behalf to the Commission, asking for his parole file. *See* ECF No. 1-18. The Commission's FOIA officer replied to the request on August 24, 2018, and provided Rodgers' parole file minus Ms. McNeil's letters and the audio recordings of the first two parole hearings. *See* ECF No. 1-19.

On July 22, 2019, a petition for a writ of habeas corpus was filed in this Court on Rodgers' behalf by the Lawyer's Committee and attorneys from Pepper Hamilton LLP.    Warden Bobbie Meeks was originally named as a Respondent, along with the Commission. Since the commencement of this action, Bradley Trate succeeded Meeks as warden and he is automatically substituted as a Respondent in this action. *See* Federal Rule of Civil Procedure 25(d) (providing that the successor of a public officer "is automatically substituted as a party"). The Respondents filed their Response to the Petition on January 9, 2020. ECF No. 22. Rodgers filed a Reply on January 24, 2020. The Respondents then filed a Sur Reply Brief on February 11, 2020. Oral argument took place on March 17, 2020, with all counsel of record participating. The petition is now ripe for review.

---

[4] Rodgers wrote to the Commission on July 1, 2018 and challenged their reference to the "aggravating circumstances" he committed while in the community. ECF No. 1-2. He argued that the Commissions' determination was based on false statements made by the victim's mother that he had approached her while living at the halfway house. *Id.* Rodgers admits that this was a mischaracterization of Ms. McNeil's testimony. *See* ECF No. 1, ¶ 71 ("Rodgers misunderstood the victim's statements during the hearing ….").

[5] Rodgers was incarcerated at FCI-McKean until February 18, 2020, when he was transferred to a halfway house. ECF No. 34.

7

IV.    The Petition

Rodgers' Petition raises two grounds for relief. First, Rodgers claims the Commission's actions in rescinding his parole violated his rights to procedural and substantive due process under the Fifth and Fourteenth Amendments to the Constitution. ECF No. 1, p. 17 *et seq.* Second, Rodgers argues that the Commissions' actions violated the Administrative Procedures Act (APA), 5 U.S.C. § 701, *et seq.* The Respondents reject these claims and suggest mootness. ECF No. 22. *See, e.g., Greco v. Doll*, 2019 WL 6045664, *1 (M.D. Pa. Oct. 29, 2019). They also contend that Rodgers' claims are not appropriate for habeas relief in that he cannot be released without the Commission first establishing a release plan. ECF No. 22 at 10. They also contest the merits of Rodgers' claimed due process and APA violations. The Court will begin with the mootness question.

V.    Rodgers' Petition is Not Moot.

A federal court has jurisdiction over a habeas corpus petition as long as the petitioner is "in custody" and that such custody is allegedly "in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2241(c)(3); *Maleng v. Cook*, 490 U.S. 488, 490 (1989). As Rodgers is currently detained within this Court's jurisdiction by a custodian within the Court's jurisdiction, and asserts that his continued detention violates due process, this Court has jurisdiction over his claims. *Spencer v. Kemna*, 523 U.S. 1, 7 (1998).

Furthermore, Rodgers' claims are not moot because he remains in custody. A petition for habeas corpus relief generally becomes moot when a prisoner is released from custody before the court has addressed the merits of the petition. *DeFoy v. McCullough*, 393 F.3d 439, 441 (3d Cir. 2005) (citing *Lane v. Williams*, 455 U.S. 624, 631 (1982)). "This general principle derives from the case or controversy requirement of Article III of the Constitution, which 'subsists through all stages of federal judicial proceedings, trial and appellate … the parties must continue to have a personal stake in the outcome of the lawsuit.'" *Id.* at 441-43 (quoting *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 477–

8

78 (1990) (internal citations and quotations omitted)). Although Rodgers has received an effective parole date of July 23, 2020, he remains in federal custody until that time.[6] Thus, because any remedy this Court may grant could affect his release date, his habeas petition is not moot. *See id.* at 442.

As a corollary to their mootness argument, the Respondents maintain that habeas relief would be inappropriate because Rodgers seeks immediate parole. ECF No. 22, p. 10. They argue that such relief is unavailable because "the Commission's grant of parole is always conditioned on the existence of a suitable release plan." *Id.* (citing 28 C.F.R. § 2.83). This regulation requires that "[a]ll grants of parole shall be conditioned on the development of a suitable release plan and the approval of that plan by the Commission." 28 C.F.R. § 2.83(a). The regulation also specifically provides for delaying a parole date if there is no release plan for the prisoner: "A Commissioner may retard a parole date for purposes of release planning for up to 120 days without a hearing ...." 28 C.F.R. § 2.83(d). *See also Trevino v. Dewalt*, 2006 WL 3256820, at *3 (E.D. Ky. Nov. 9, 2006) (USPC properly retarded parole date pursuant to 28 C.F.R. § 2.83(d) absent a satisfactory release plan); *Housler v. Nelson*, 453 F. Supp. 874, 876 (D. Conn. 1978) (release on parole was delayed because of the lack of a suitable release plan); *Paulus v. Fenton*, 443 F. Supp. 473, 477 (M.D. Pa. 1977) (same). Respondents' argument, in effect, is that the lack of a release plan for Rodgers somehow negates this Court's authority to grant the writ. That argument does not withstand scrutiny.

For certain, "the appropriate judicial remedy when an agency exceeds its discretion is a remand to the agency for further proceedings consistent with the court's opinion." *Bridge v. United*

---

[6] Rodgers' release to a halfway house on February 28, 2020 does not change the Court's determination that the petition is not moot. Even though Rodgers resides in a halfway house, he remains in the custody and control of the Commissions and, by extension, the Bureau of Prisons. As Respondents acknowledged at oral argument, the Commission's parole decision is subject to rescission any time prior to its effective date. Further, as demonstrated by the Commission's prior actions in this case, Rodgers may be transferred back to a federal prison without any showing of misconduct on his part. Thus, he has not been released from BOP custody. *See, e.g., DeFoy v. McCullough*, 393 F.3d 439, 441 (3d Cir. 2005) ("[A] petition for habeas corpus relief generally becomes moot when a prisoner is released from custody before the court has addressed the merits of the petition.").

9

*States Parole Comm'n*, 981 F.2d 97, 105 (3d Cir. 1992) (citing *Fed. Pwr. Comm'n v. Idaho Pwr. Co.*, 344 U.S. 17, 20 (1952). *See also Reyes v. Fed., Bureau of Prisons*, 2019 WL 4302964, *1 (D.N.J. Sept. 11, 2019) (citing *Cannon v. Shultz*, 2010 WL 2539387, *6 (D.N.J. June 16, 2010) ("[E]ven if a federal court determines that an inmate's due process rights were violated during an administrative hearing, the federal court does not conduct its own 'trial' superseding a defective administrative proceeding: in such cases, the proper remedy is a curative administrative hearing conducted in accordance with due process requirements."). But that does not mean a federal court lacks the authority to grant the writ and order a prisoner's immediate release. *See Bridge*, 981 F.3d at 105 (quoting *Billiteri v. United States Bd. of Parole*, 541 F.2d 938, 946 (2d Cir. 1976) ("If the case was before the court on a petition for habeas corpus, it may order compliance within a reasonable period, failing which it may order the petitioner discharged from custody."); *Mickens-Thomas v. Vaughn*, 355 F.3d 294, 310 (3d Cir. 2004) (ordering Parole Board to release petitioner on parole without preconditions).

Perhaps more importantly, the Respondents mischaracterize the remedy Rodgers seeks. They argue that Rodgers petitions this Court to "judicially determine [his] eligibility for parole." ECF No. 22, p. 11. Rodgers had already been granted parole. Yet he remains in custody. His petition seeks to redress what he argues are the "unconstitutional and unlawful actions" of the Commission in rescinding its grant of parole. ECF No. 24, p. 5 (emphasis in original).

Lastly, the record reveals that Rodgers has a release plan which was put in place when he was granted parole in 2017. *See* ECF No. 1-6, p. 4. This plan, among other things, projects that Rodgers will live with his mother in a four-bedroom apartment she maintains in Washington, D.C. and that he will obtain employment as a dry-waller, given the training he received in that skill while incarcerated. *Id.* Further, the Respondents have not offered any evidence to indicate their inability to process Rodgers with immediacy should this Court grant his petition. Indeed, given his parole

date of July 23, 2020, and recent release to a half-way house, the finalization of such plans are likely already underway.

Thus, the Court does not find Rodgers' petition to be moot and will review the merits of his claims.

VI.    Standards of Review Applicable to Commission Decisions

Before turning to the merits of the claims, the Court takes notice of the appropriate standards of review. Generally, federal courts defer to the decisions of the Commission. *See Wilson v. United States Parole Comm'n*, 193 F.3d 195, 197 (3d Cir. 1999) (citing *Zannino v. Arnold*, 531 F.2d 678, 690-91 (3d Cir. 1976)). However, in reviewing such decisions, the Court is obligated to determine whether the Commission "has followed criteria appropriate, rational, and consistent with its enabling statute and that its decision is not arbitrary and capricious, nor based on impermissible considerations." *Zannino*, 531 F.2d at 690.

Further, the Court recognizes that the Commission is vested with discretion to determine a District of Columbia prisoner's eligibility for parole. *See United States v. Addonizio*, 422 U.S. 178 (1979). This Court's review of such a decision is "not whether the [decision of the] Board is supported by the preponderance of the evidence, or even by substantial evidence; the inquiry is only whether there is a rational basis in the record for the [Commission's] conclusions embodied in its statement of reasons." *Zannino*, 531 F.2d at 6. *See also Furnari v. Warden, Allenwood Fed. Corr. Inst.*, 218 F.3d 250, 254 (3d Cir. 2000); *Walker v. Perdue*, 2018 WL 6304230, *4 (M.D. Pa. Dec. 3, 2018) ("The applicable standard of judicial review is whether the Parole Commission abused its discretion … Review is limited to whether there is a rational basis in the record for the conclusions embodied in the Commission's statement of reasons, which should include whether the criteria, appropriate, rational, and consistent with its enabling statutes, has been followed so that its decision is not arbitrary and capricious, nor based on impermissible considerations."). "To this end, 'the

11

Commission may not base its judgment as to parole on an inaccurate factual predicate.'" *Furnari*, 218 F.3d at 254 (citing *Campbell v. United States Parole Comm'n*, 704 F.2d 106, 109 (3d Cir. 1983)). Additionally, this Court is mindful that "[a] legislative grant of discretion does not amount to a license for arbitrary behavior." *Block v. Potter*, 631 F.2d 233, 236 (3d Cir. 1980) (citations omitted).

With these standards in mind, the Court turns to the merits of the claims raised in Rodgers' petition.

VII.    The Merits of the Petition

    A.    The Due Process Claims

Rodgers claims that the Commission's actions in reopening and rescinding his parole violated his rights to procedural and substantive due process under the Fifth and Fourteenth Amendments. ECF No. 1, p. 17 *et seq.* Generally, to satisfy due process, parole procedures must provide an opportunity to be heard and a statement of reasons for the Commission's decision. *See Greenholtz v. Inmates of Neb. Penal & Corr. Complex*, 442 U.S. 1, 16 (1979). The Court turns first to Rodgers' procedural due process claim.

        1.    Procedural Due Process - The Liberty Interest

"It is axiomatic that a cognizable liberty or property interest must exist in the first instance for a procedural due process claim to lie." *Mudrick v. Attorney Gen. of U.S.*, 469 F.3d 94, 98 (3d Cir. 2006) (citing *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 569 (1972)). The Parties strongly disagree whether Rodgers has a liberty interest at stake here. The Constitution itself does not create any liberty interest in parole and any such interest must emanate from state law, or in this case, District of Columbia law. *See Greenholtz*, 442 U.S. at 7. Therefore, Respondents argue, Rodgers has no liberty interest in being conditionally released before the expiration of his sentence. *Id.* And that position is correct—Rodgers has no liberty interest in being paroled. However, although a convicted individual has no liberty interest in parole release protected by the Due Process Clause, a

fundamental due process right to be free from "capricious decision making" does protect parole applicants from being denied parole for "arbitrary or constitutionally impermissible reasons." *Smallwood v. Oddo,* 2019 WL 5260417, *3 (M.D. Pa. Oct. 17, 2019) (citing *Block,* 631 F.2d at 236). That is, judicial review is limited to a consideration of whether the Commission "exceeded its legal authority, acted unconstitutionally, or failed to follow its own regulations." *See Fardella v. Garrison,* 698 F.2d 208, 210 (4th Cir. 1982). *See also Bono v. Benov,* 197 F.3d 409, 411 (9th Cir. 1999) (Commission's decisions to grant or deny parole are unreviewable, but federal courts have jurisdiction to consider claims alleging the Commission violated the Constitution). The Supreme Court has long held that the possible deprivation of a liberty interest in a parole revocation proceeding entitles a parolee to obtain due process protections. *Tippens v. Luther,* 869 F. Supp. 331, 335 (W.D. Pa. 1994) (citing *Morrissey v. Brewer,* 408 U.S. 471, 484 (1972)).

Here, Rodgers' procedural due process claim contends that the Commission impermissibly failed to follow its own regulations by not basing its decision to reopen his parole determination on "new and significant" information as required by 28 C.F.R. § 2.75(e). Accordingly, resolution of this claim begins with the applicable regulation.

2.    The Federal Regulations

Two federal regulations are of particular relevance in this case. Parole reconsideration hearings for prisoners serving District of Columbia sentences are governed by 28 C.F.R. § 2.75. That regulation permits the Commission to reopen parole proceedings when it receives "new and significant information concerning the prisoner." 28 C.F.R. § 2.75(e) (citing 28 C.F.R. § 2.28). This includes the "receipt of new information of substantial significance favorable to the prisoner" or any "adverse information." 28 C.F.R. § 2.28(a), (f). Section 2.75(e) further authorizes the Commission, within its discretion, to hold a § 2.28-type of hearing where new information about a District of

13

Columbia prisoner becomes available.[7] *See, e.g., Otts v. United States Parole Comm'n*, 2005 WL 2106244, *5 (M.D. Pa. Aug. 31, 2005). The rehearing process begins with one Commissioner recommending reconsideration to the others. *See Hill v. United States Parole Comm'n*, 2017 WL 2414446, *2 (D.D.C. June 2, 2017). This referral "automatically retard[s] the prisoner's scheduled release date until a final decision is reached in the case." *Id.* Then, if two Commissioners concur in a reopening, a new hearing is set. *Id.* That is not exactly what happened here. Instead, and as recounted above, a Commission staff member recommended that, in light of her discussions with the victim's mother, the matter be reopened.

28 C.F.R. § 2.28 also governs the reopening of parole decisions and is incorporated by reference into 28 C.F.R. § 2.75, *supra*. This regulation provides that the Commission may reopen a case when favorable information, institutional misconduct, an additional sentence, a conviction after revocation, unresolved release planning, or new adverse information is present. 28 C.F.R. § 2.28(a)-(f). It is worth noting that both these regulations limit the Commission's authority to reopen a grant of parole to the circumstances outlined in their provisions. 28 C.F.R. § 2.28, for example, specifically delineates the circumstances when a parole decision can be reopened. No provision gives the Commission the authority to reopen a parole case based on information it finds potentially relevant and neither regulation gives the Commission unlimited authority to act within its discretion.[8]

---

[7] This regulation provides: "Upon receipt of new and significant adverse information that is not covered by paragraphs (a) through (e) of this section, a Commissioner may refer the case to the National Commissioners with his recommendation and vote to schedule the case for a special reconsideration hearing. Such referral shall automatically retard the prisoner's scheduled release date until a final decision is reached in the case. The decision to schedule a case for a special reconsideration hearing shall be based on the concurrence of two Commissioner votes, including the vote of the referring Commissioner. The hearing shall be conducted in accordance with the procedures set forth in §§ 2.12 and 2.13. The entry of a new order following such hearing shall void the previously established release date." 28 C.F.R. § 2.28(f).

[8] A final regulation has similar provisions. 28 C.F.R. § 2.86(b) also applies to D.C. Code offenders and provides: "The Commission may reconsider any grant of parole prior to the prisoner's actual release on parole, and may advance or retard a parole effective date or rescind a parole date previously granted based upon the receipt of any new and significant information concerning the prisoner, including disciplinary infractions. The Commission may retard a parole

14

### 3. "New and Significant Information"

The gist of Rodgers' procedural due process claim is that "because the 2017 communications from Ms. McNeil did not contain any new and significant information, and because Ms. McNeil had been properly notified prior to the 2017 hearing in accordance with the CVRA, the decision to schedule a special reconsideration hearing and suspend Rodgers' scheduled release date of July 23, 2018," violated his procedural due process rights. ECF No. 1, ¶ 97. Neither party disputes that the Commission has the authority, upon the receipt of "new and significant adverse information" to reopen a previous parole decision and "void the previously established release date." 28 C.F.R. § 2.28(f). The question is what constitutes "new and significant" information under the regulation and whether such information was present here so as to support the Commission's actions.

In the context of reopening a parole decision, new information is "not strictly limited to information that a Commission was previously completely unaware of," but more broadly encompasses "previously existing information that was not considered at the initial hearing." *Davis v. Brown*, 311 F. Supp.2d 110, 113 (D.D.C. 2004) (quoting *Fardella v. Garrison*, 698 F.2d 208, 211 (4th Cir. 1982). *See also Frassetto v. Perrill*, 955 F.2d 176, 178 (2d Cir. 1992) (collecting cases); *Lewis v. Beeler*, 949 F.2d 325, 329 (10th Cir. 1991) ("Because the Commission is not primarily an investigative body and must depend largely on interested parties for relevant information, it will sometimes need to review previously considered allegations in light of newly received information. It is for this reason that the Commission is given the power to reopen cases.").

By way of example, in *Bono v. Benov*, 197 F.3d 409, 421 (9th Cir. 1999), the Commission "received a letter from the victim's daughter, describing the impact of her father's death upon her life and opposing [the petitioner's] release" on parole. *Id.* at 414. The Commission then remanded

---

date for disciplinary infractions (e.g., to permit the use of graduated sanctions) for up to 120 days without a hearing, in addition to any retardation ordered under § 2.83(d)." *See also Boling v. Rivera*, 2011 WL 6182124, *8 n. 17 (D.S.C. Dec. 13, 2011).

15

the petitioner's case to a parole hearing examiner for "rehearing" purportedly to give the petitioner

an opportunity to respond to the victim's letter. *Id.* On remand, the hearing examiner, concluded:

> [A]fter careful review of the letter ... this examiner does not believe
> that it substantially changes the underlying nature of the offensive
> behavior. While the Commission may not have known the exact
> feelings of the family members of the victims, it was well aware that
> [Bono] caused the loss of life of two individuals who were doing their
> duty as law enforcement office[r]s and certainly their deaths had [an]
> adverse impact upon the lives of both families of the victim[s].
> Thus[,] this examiner does not believe that any change should be
> made on the basis of the most recent letter in terms of the subject's
> presumptive parole date.

*Id.* at 414-15. The Commission rejected the hearing examiner's recommendation and extended the

petitioner's presumptive parole date by twelve years, making no mention of the victim's letter. *Id.* at

415. The petitioner filed for habeas corpus relief which the district court granted. On appeal, the

Government maintained that "the victim letter constituted 'new and significant adverse

information,' which served as objective evidence justifying the extension of Bono's presumptive

parole date." *Id.* at 421. In affirming the district court's decision, the Court of Appeals for the

Ninth Circuit held that the victim's letter did not represent new and significant information:

> The victim letter, although compelling and perhaps an emotional
> impetus for the Commission's decision, did not constitute new and
> significant adverse information. The letter did not provide the
> Commission with any information that was not available to it at the
> time it set Bono's original presumptive parole date. From the
> moment Bono entered the federal parole system, the Commission
> was aware that the Border Patrol agent had left behind a family, who
> would be deeply affected by his murder. Although the letter provides
> a moving account of the difficulties faced by the victim's daughter as
> she grew up fatherless, it does not provide any information that was
> not before the Commission at the time Bono's original presumptive
> parole date was determined.

*Id.*

The same is true here. The Commission held three hearings in Rodgers' case: one in 2015, a

second proceeding in 2017, and the last one in 2018. Ms. McNeil testified via video at Rodgers' first

16

parole hearing on October 5, 2015. ECF No. 1-3, p. 2. She also had communicated with the

Commission prior to this hearing. Ms. McNeil verbally read from a written statement which was

put, in its entirety, into the Commission's file. *Id.* Although no transcript of this hearing was

provided to the Court, an audio recording was. According to this recording, Ms. McNeil offered the

following testimony to the Commission:

> ... no one can get my son back. But you can give me justice and save
> the lives of others. I truly believe that Marcus Rodgers gunned
> Christian down and he could do it again. Witnesses say my son was
> crawling and begging for his life. Marcus – you know the moment –
> you could have let him live. Marcus, who made you God? God has
> been known to show mercy ... Christian will never be a father;
> Christian was 24-years old and had no children; he will never be
> grandfather; or even a great-grandfather; and its possible that people
> live very long lives. And I will never be a grandmother. My daughter
> had no children. Christian was very devastated when his sister and
> grandmother died. Christian lost his only best buddy. One can get
> over, eventually maybe possible, loosing someone to natural death.
> But you can never get over cold blooded murder. Christian was
> crawling and begging for his life. I've cried many days and nights.
> Please Jesus, help my baby to crawl to safety and be able to live. I've
> been helping Christian to follow in his grandfather's footsteps to be a
> chef; not a cook. His grandfather saw him grow ... Christian mowed
> lawns, washed cars, built bicycles and cleaned snow for the neighbors
> ... Christian was a teenager. He even had a job ... working for a
> company building bicycles. Christian would pick me up from work,
> or meet me, especially when it was getting dark outside.
>
> After Christian's sister and grandmother died, he would come and sit
> with me at work. And we'd go home and Christian would cook.
> Christian's sister was teaching me to play the violin because my
> mother could play the piano. Christian was teaching me to play the
> drum. His grandmother had brought him a drum set before his
> death. I lost three family members in one decade, but only Christian
> to murder. Christian was the only grandson ... what do I say when
> people ask if I have any children; what do I say when they ask if I
> have any grandchildren? Christian's family – aunts, uncles, cousins,
> and fiancé wanted Christian to have a special casket, so we ordered a
> casket, so Christian could rest in peace after the brutality he suffered.
> Christian had to be laying there knowing he was dying and I was not
> with him.
>
> Christian is buried in the family cemetery. It goes back to slavery.
> Christian should not be there because he was murdered. I should

17

have been there first. Marcus Rodgers may have been locked up, but he is alive. His sentence is life without parole ... even to this day, I felt that he was a life sentence and can't be paroled. I try so very hard to keep remembering what my son looked like, his voice, its so hard to be alone. And no one to help me. It's always good to have your own flesh and blood to lean on. Who will bury me? Where is my son? Who will look down in the casket and say goodbye to me? Where is my son? Who will order my casket? Christian's father died when Christian was a baby. Some people say it is better with 20 years. Marcus' family gets to visit you; talk to him; Marcus can talk to them. My son cannot talk to me. I can never ever move on [from] Christian crawling and begging for his life. I wish I was there. I would have reached out and pulled my son to life. Just like when I gave birth to Christian. Natural – and doctor pulled him to life. And he grabbed his legs and natural childbirth. I was glad he came in front of that baby to save his life. If I could have Christian back ... and write this victim impact statement, there would always be tears in my eyes and soul, permanent and forever.

Christian would take me to the movies – his friends started taking their mamas. Christian started taking me to the movies when he was a young boy. Guys at the movies who didn't know would ask him, who is she? And Christian would proudly say, my mother, enjoying life after working so hard to take care of me and my sister. Christian and I had a real live Christmas tree, and a nice old-fashioned Christmas. In 1995, it had been snowing in January and February. January is Christian's birthday month. Very cold outside. That's when Marcus Rodgers cold blooded gunned down my son. While Christian was crawling ... I'm begging you to keep Marcus Rodgers in prison. If I need to call you to keep Marcus Rodgers in prison, I will. Christian ... crawled and begged. I have not had another Christmas. I only had one son. Christian was the baby.

I would just like to add, as you can see, what's going on in Washington, DC. I believe that Marcus Rodgers, if he is put back out on the street, there will be a lot more deaths, and that he is exactly where he needs to be, where mothers can sleep at night, I can sleep at night, and where the parole commissioners can sleep at night. Thank you.

ECF No. 1-4. The foregoing constitutes all of the information Ms. McNeil provided to the

Commission at the October 17, 2015, hearing. Rodgers testified that day as well, addressing Ms.

McNeil directly:

Miss McNeil, I understand. Your words are very brave. Great pain, and its like stab wounds in my heart, because for some reason, you

18

think I'm a monster. I'm no monster. I never had a mother in my
life. Ain't had a father in my life. Jail was my mother. Incarceration
was my father. Doesn't mean I'm telling you I come from a bad
home because I didn't, but I made some wrong choices. I never had
a criminal record. I had never taken a man's life. But I understand
what you're going through and I understand your loss. But I've lost
... I've lost. You know, there's a time when a man lives in darkness
so much, that the darkness don't want him – so he had to come to
the light. I'm not saying I'm glad your son died, but understand what
I'm saying, that your son and certain circumstances changed my life.
I know you probably can't understand how can life come from death.
But I came from death. What you see before you is not a façade, its
who I am. I have never been a bad person. I've made some wrong
choices, but I'm not a monster. No one of my family or friends
would ever tell you I'm a monster; cause I'm no monster.

But I hope somewhere in your heart, that you forgive me. And, um,
I'm sorry. I'm sorry for ... I owe you that ... I've never told anyone
how I felt about the crime. But I'm telling you that I'm sorry. I
accept your words, because even in your words there is a force. Even
in your words, it will continue to inspire me to be good and do good.
So your words will not go unheard. And I accept everything you say
about me, but I'm no monster. I may have been a monster in that
act, but I'm no monster. God don't make monsters. So God
brought me this far to be who I am today. I want to continue to be
who I am today. Because I love being who I am today. I didn't love
Marcus; I didn't love the act, and I'm sorry that it happened. Thank
you.

*Id.*

At the second parole hearing on October 10, 2017, Hearing Examiner Stephen Husk began

by noting that "I noticed at the [previous] hearing we had victim representation attending and we

don't have that this time; doesn't mean they're not interested in it; just for some reason

communication wasn't able to be secured." ECF No. 1-11. The Hearing Examiner described Ms.

McNeil's testimony at the 2015 hearing as "pretty gut-wrenching statements and I see they read

them into the record last time ... it was gut-wrenching for them to have to lose their child like that."

*Id.* Rodgers told Hearing Examiner Husk that at the time of the offense, he "didn't know better."

*Id.* He stated that he can "perceive what she feels. I'm sorry. I wish I could bring Christian McNeil

back. I wish I could have thought the situation through. I try to put myself in his place, but it was

such a dark place ... I'm not justifying what I did, because what I did was wrong. I know what I did was not the right choice to take the man's life." *Id.* When asked by the Hearing Examiner what he might say to the victim's mother, Rodgers testified that

> I would tell her I'm sorry for that. If there's such a thing as amendment and mercy, I would hope that she would look at me and see that I have been trying. I have not been sitting here docile, idling my life. I was eighteen. I've been trying man, I've been trying, since I was eighteen years old, I've been trying. I'm not a bad man ... so I would tell her I'm apologizing and if she can have mercy and forgive me and look at my behavior modification, look at the training that I have done within myself and see the atonement, I'm still atoning now, I'm still trying to better myself every day I work hard ... I would tell her that I'm sorry, like I told before, and if she can forgive me, that forgiveness would take me a long way, because I don't have forgiveness ... if she can forgive me, it would help me more to aspire to be creative in my life."

*Id.*

Hearing Examiner Husk also presided over Rodgers' 2018 rehearing and began by acknowledging that the "primary purpose of this hearing is really for the victim participation." ECF No. 1-14. He acknowledged: "there isn't any new information. I've basically stated only we're doing this hearing because the victim contacted the parole commission after your hearing." *Id.* After hearing from Rodgers, Hearing Examiner Husk called on Ms. McNeil to speak. She offered testimony via video. A comparison of Ms. McNeil's 2015 testimony and her 2018 testimony, however, does not reveal any "new and significant" information. In fact, much—if not all—of her testimony was repetitive—in some cases verbatim—from her testimony at Rodgers' first parole hearing. The following chart is illustrative:

| Ms. McNeil Testimony at October 5, 2015, Hearing (ECF No. 1-4) | Ms. McNeil Testimony at June 4, 2018, Hearing (ECF No. 1-11) |
|---|---|
| Witnesses say my son was crawling, begging for his life | Rodgers left Christian crawling and begging for his life |
| Marcus-you know the moment-you could have let him live | Marcus-you know the moment you could have let him live |

| Ms. McNeil Testimony at October 5, 2015, Hearing (ECF No. 1-4) | Ms. McNeil Testimony at June 4, 2018, Hearing (ECF No. 1-11) |
|---|---|
| Marcus-who made you God? God has been known to show mercy | Who made you God? God can show mercy |
| Christian will never be a father; Christian was 24 years old and had no children; he will never be a grandfather or great-grandfather | [Christian] didn't have any children; he will never be a father |
| I will never be a grandmother | I will never be a grandmother |
| Christian was devasted when his sister and grandmother died; Christian's sister was his "best buddy" | Christian lost his other best buddy, my daughter |
| One can get over, eventually, losing someone to natural death; but you can never get over cold blooded murder | One can get over (inaudible) a natural death but you can never get over cold-blooded murder |
| Christian was crawling and begging for his life | Christian was crawling and begging for his life |
| I've cried many days and nights, "Please Jesus, help my baby to crawl to safety and be able to live" | I have cried many days and nights, "Please Jesus, help my baby crawl to safety and be able to live" |
| I've been helping Christian to follow his grandfather's footsteps to be a chef; not a cook | Christian was so happy to get a cooking job |
| What do I say when people ask me if I have any children? What do I say when they ask if I have grandchildren? | What do I say to people who ask me if I have any children? What do I say when they ask me if I have any grandchildren? |
| Christian's family-aunts, uncles, cousins, and fiancé wanted him to have a special casket, so we ordered a casket so Christian could rest in peace after the brutality he suffered | Christian's family-aunts, uncles, cousins, and fiancé-wanted him to have a special casket; so we ordered the casket so Christian could rest in peace after the brutality he suffered |
| Christian had to be laying there knowing he was dying and I was not with him | Christian had been laying there knowing he was dying, and I was not with him |
| Christian was buried in the family cemetery; it goes back to slavery; Christian should not be there because he was murdered | Christian is buried in the family cemetery that goes back to slavery; Christian should not be there |
| Rodgers may be locked up, but he is alive | Rodgers may be locked up, but he is alive |
| I try very hard to keep remembering what my son looked like, his voice, it's so hard to be alone, and no one to help me | I try very hard to remember what my son looked like; his voice |
| Who will bury me? | No one's left to bury me |
| Who will look down in my casket and say goodbye to me? Who will order my casket? | Who will look down at my casket and say goodbye Mom? |
| Marcus' family gets to visit [him], talk to him, Marcus can talk to them | Marcus' family gets to visit him, talk to him, Marcus can talk to them |
| I can never move on from Christian crawling and begging for life | Rodgers left Christian crawling and begging for his life |
| I wish I was there. I would have reached down and pulled Christian to life | Christian had to be laying there knowing he was dying and I was not with him |

| Ms. McNeil Testimony at October 5, 2015, Hearing (ECF No. 1-4) | Ms. McNeil Testimony at June 4, 2018, Hearing (ECF No. 1-11) |
|---|---|
| Christian would take me to the movies; Christian would proudly say, [this is] my mother | Christian [inaudible] taking me to the movies, and all his friends started taking their mothers; Christian would proudly say to them, this is my mother |
| Christian and I had a real, live Christmas tree and an old-fashioned Christmas | Christian and I had a real live Christmas tree, and a nice old-fashioned Christmas in 1995 |
| In 1995, it had been snowing in January and February; very cold outside | It was very cold outside when Marcus gunned him down |
| I had only one son; Christian was the baby | Christian was the baby |
| With what's going on in Washington, DC, I believe that Marcus Rodgers, if he is put back out on the street, there will be a lot more deaths; he is where he needs to be, where mothers can sleep at night, I can sleep at night, and where the parole commissions can sleep tonight | Marcus is going to kill again, at least keep one cold-blooded killer off the streets of Washington, DC; I'm afraid Marcus Rodgers is going to retaliate against me and my family; thought of Rodgers release puts [me] in fear for [my]; concerned Marcus can find me because of the internet |

None of this information is new because it was presented to the Commission in 2015. It cannot be said, therefore, that the information presented by Ms. Neil in 2018 was "not considered at the initial hearing" in 2015. *See Davis*, 311 F. Supp. 2d at 113 (citation omitted). Put another way, Ms. McNeil's 2018 testimony did not provide the Commission with "any information that was not available to it at the time it set [Rodgers'] presumptive parole date." *Bono*, 197 F.3d at 421. Therefore, none of that testimony is "new and significant" information which would have permitted the Commission to reopen and rescind Rodgers' parole.

Ms. McNeil did make a few statements in 2018 that she did not make, at least specifically, in 2015. For example, she stated that Rodgers "never said he was sorry at the first hearing in 2015, or showed any remorse to me." ECF No. 1-11. Further, she stated that "I don't believe Marcus can ever say the words 'I'm sorry, please forgive me.'" *Id.* These statements belie the record, however. Rodgers did in fact apologize to Ms. McNeil at his 2015 hearing and did so again at the 2017 and 2018 hearings. *See* ECF No. 1-4; ECF No. 1-11; ECF No. 1-14. Thus, Rodgers' alleged failure to

apologize is not "new and significant" information which would have permitted the Commission to reopen and rescind Rodgers' parole.

The only testimony of Ms. McNeil's from 2018 that does not appear to have been raised at the 2015 hearing was her statement that Rodgers used "armor-piercing bullets." ECF No. 1-11. It appears that this information was not before the Commission in 2015 and thus, could be considered "new." However, it is not "significant." That is, it is not significant because this statement was offered as part of a broader discussion of Ms. McNeil's fear for her own personal safety and that of the community in general, which she testified to in 2015 and again in 2018. Thus, her fear for her safety and for the safety of Washington, D.C. if Rodgers were to be released was before the Commission in 2015.

Additional support for the determination that the 2018 hearing lacked any new and significant information can be found in the comments of Hearing Examiner Husk. The Hearing Examiner opened the 2017 hearing with an acknowledgement that the "primary purpose of this hearing is really for victim participation." ECF No. 1-11. He continues, observing that "there isn't any new information. I've basically stated only we're doing this hearing because the victim contacted the parole commission after your hearing." *Id.* Husk concludes the hearing with the admission that "the circumstances of this were not ideal … Ideally, [the hearing] wouldn't have happened while you were released to a halfway house." *Id.* Furthermore, in the summary of the 2018 hearing, the Hearing Examiner indicated only that the "parole grant was pulled back after the deceased victim's mother contacted the USPC and advised of her intent to exercise her right to testify at the hearing. Thus, today's hearing was a special reconsideration for that purpose." ECF No. 1-9.

Ms. McNeil's continuing grief is evident from both the audio recordings of the 2015 and 2018 hearings and her written submissions, and this Court in no way discounts it. Yet, the Court is

23

left with the inescapable conclusion that the Commission failed to follow its own rules and procedures in this case, to the detriment of Rodgers. Thus, this Court must conclude that the Commission violated Rodgers' right to procedural due process and will grant his petition on that basis.

### 4. The Substantive Due Process Claim

Rodgers also claims that the Commission's actions violate his substantive due process rights. ECF No. 1, ¶¶ 99-119. "[O]nce a state institutes a parole system, all prisoners have a liberty interest flowing directly from the due process clause in not being denied parole for arbitrary or constitutionally impermissible reasons." *Block*, 631 F.2d at 236. Thus, Rodgers has a substantive due process right in being treated fairly during the parole process. *See Jubilee v. Horn*, 975 F. Supp. 761, 764-65 (E.D. Pa. 1997), *aff'd*, 151 F.3d 1025 (3d Cir. 1998); *accord Bermudez v. Duenas*, 936 F.2d 1064, 1067 (9th Cir. 1991) (recognizing that "early release statutes can create 'a liberty interest protected by due process guarantees.'") (quoting *Greenholtz*, 442 U.S. at 12). The Court of Appeals for the Third Circuit has further explained, "[t]he substantive component of the due process clause is violated by [state conduct] when it can properly be characterized as arbitrary, or conscience shocking, in a constitutional sense." *Gottlieb ex rel. Calabria v. Laurel Highlands Sch. Dist.*, 272 F.3d 168, 172 (3d Cir. 2001) (quoting *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 847 (1998)). Rodgers argues that because the Commission's actions were unsupported by the record (and therefore were arbitrary) and the consequences to Rodgers severe, the reopening and revocation of his parole by the Commission shocked the conscience. ECF No. 24, p. 14. *See, e.g., Barnes v. Wenerowicz*, 280 F.R.D. 206, 218 (E.D. Pa. Feb. 7, 2012) ("A federal habeas court … may grant relief … only 'if there is [no] basis for the challenged decision.'" (quoting *Hunterson v. Disabato*, 308 F.3d 236, 246 (3d Cir. 2002)). He specifically faults the actions of Commissioner Massarone, arguing that his parole was reopened only to give Massarone another "bite at the apple." ECF No. 1, ¶ 118.

When the Commission originally voted to grant Rodgers parole on October 12, 2017,

Massarone was in the minority.[9] *See* ECF No. 1-6, p. 6. The Commissioner filed a Memorandum

the following day, which purported to state his reasons for voting against Rodgers' parole. *See* ECF

No. 1-24. This memorandum is somewhat confusing as it is written from the point of view that

Rodgers had been denied parole, when in fact he had not. Massarone stated:

> The Commission (*sic*) basis for the parole denial was [Rodgers']
> failure to obtain programs addressing your criminal behavior and
> thinking ... Your lack of programming in areas of education and
> victim impact, your lack of progress may create an unacceptable risk
> to public safety and the fundamental skills necessary to successfully
> complete supervision ... The Commission orders the following, due
> to your nature of the violation (*sic*) the aggravating circumstances and
> your actions while in the community. Your lack institutional
> experience such as your lack of success towards your educational
> development and victim's impact programming. (*sic*) Therefore, the
> USPC determines that there is a reasonable probability that you will
> not live and remain at liberty without violating the law, and that your
> release is incompatible with the welfare of society. Deny parole and
> continue for a rehearing after the service of 24 months.

ECF No. 1-24, p. 2. When Rodgers' parole was revoked in 2018, Commissioner Massarone pointed

to the above as the basis for that decision: "As stated on 10/12/2017 deny parole and continue for a

rehearing in 10/2017 (*sic*) after the service of 24 months from your last hearing date 10/10/2017.

(Reasons listed on the 10/13/2017 memo)." ECF No. 22-13, p. 2.

This Court's review is limited to whether there is a rational basis in the record for the

conclusions embodied in the Commission's statement of reasons, "to insure that the Board has

followed criteria appropriate, rational and consistent with the statute and that its decision is not

arbitrary and capricious, nor based on impermissible considerations." *Zannino*, 531 F.2d at 690–91

(citations omitted). The Court cannot substitute its judgment for that of the Commission unless the

---

[9] Commissioner Massarone's hand-written vote states: "Deny parole, Continue for a hearing (24) months from your
hearing date 10-10-2017." ECF No. 1-6, p. 6.

Commissions' exercise of discretion represents an egregious departure from rational decision-making. *See Butler v. U.S. Parole Commission*, 570 F. Supp. 67, 77 (M.D. Pa. 1983).

Here, the Commissions' actions were arbitrary because they were unsupported—and in larger part, contradicted—by the record. First, Commissioner Massarone stated that the denial of parole was based on Rodgers' "failure to obtain programs addressing your criminal behavior and thinking." ECF No. 1-24, at p. 2. Massarone does not specify which programs he means. The record, however, does not support this conclusion. Hearing Examiner Hylton noted in 2015 that Rodgers did participate in numerous programs: "The subject stated that he has taken numerous programs since his incarceration to include GED, Victim Impact, CDL (commercial driver's license), Drywall, Breaking Barriers, Rational Thinking, and Metaphysics." ECF No. 1-3, p. 3. Two years later, Hearing Examiner Husk also noted the various additional programs Rodgers took part in: "… these programs that were cited in the pre-hearing assessment (totaling 39 hours)." ECF No. 22-6. Husk specifically stated that these programs included a class designed "to address his criminal behavior – Victim Impact." *Id.*[10] The 39 hours of additional programming included "7 Habits of Effective People" (14 hours), CDL (24 hours), and "Social Security" (1 hour). *Id.* Thus, the record does not support Commissioner Massarone's contention that Rodgers lacked "programming in areas of education and victim impact." ECF No. 1-24, p. 2. The Commission's conclusion that Rodgers failed "to obtain programs addressing [his] criminal behavior and thinking" is an arbitrary one because it is not supported by the record, and is directly contradicted by the reports of two separate hearing examiners.

---

[10] The prehearing assessment referenced by Hearing Examiner Husk does not appear to be part of the record. However, a document entitled "DC Board of Parole Guideline Hearing" authored by Oscar K. Vela and dated September 14, 2017, is an exhibit attached to the Response. ECF No. 22-6. This document acknowledges that is was taken "in part, from a PHA [pre-hearing assessment] dated 7/23/2015 by Examiner Kubic. It has been updated to reflect current action." *Id.*

Further, Massarone's statement in 2017 that Rodgers' "actions while in the community" negated the granting of parole is puzzling. ECF No. 1-34, p. 2. For one thing, in 2017, Rodgers had not yet been released on parole, so he could not have undertaken any improper or illegal actions while in the community. For another, Rodgers' prison disciplinary record had been exemplary since 2003, and his record while at the halfway house was unblemished. And, if the Commission based his decision on some infraction Rodgers committed while at the halfway house in 2018, the record does not support such a finding. Hearing Examiner Husk, in his hearing summary of June 4, 2018, specifically observed that following Rodgers parole grant in 2017, "[h]e was subsequently transferred to a halfway house (RRC) and had not sustained any new incident reports." ECF No. 1-9, p. 3.

Other reasons for rescinding Rodgers' parole, according to Commissioner Massarone, were the "nature of the violation," and "aggravating circumstances." Here, Rodgers appears to argue that the Commissioner's conclusion borders on vindictiveness. *See* ECF No. 1, ¶ 114 (citing *Mickens-Thomas*, 355 F.3d at 307-08). The Third Circuit has warned against relying on "historical information not previously relied upon [which is] designed to achieve a non-parole decision" because such reliance raises an "inference of pretext or vindictiveness." *See Marshall v. Lansing*, 839 F.2d 933, 948 (3d Cir. 1988) ("[T]he Commission's unexplained decision before the time of the original sentencing proceeding, which it ignored until its parole release determination was judicially put into question, creates a sufficient appearance of vindictiveness to justify voiding the penalty."). Perhaps most concerning is Commissioner Massarone's admission in his June 7, 2018, memorandum regarding the reasons for reopening Rodgers' prior parole decision. He states that the matter was "reopened and schedule[d] for a special reconsideration hearing due to the victim was unable to exercise her right to participate in the parole hearing ...." ECF No. 22-13, p. 2.

All of these actions lead the Court to no other conclusion but that the Commission acted arbitrarily in rescinding Rodgers' parole. Such actions shock the conscience and therefore violate Rodgers' rights to substantive due process.

B.    Administrative Procedure Act Claim

Rodgers also alleges that the Commissions' actions in revoking his parole violated the Administrative Procedure Act (APA), 5 U.S.C. § 701, *et seq.* ECF No., ¶¶ 120-133. The Respondents do not dispute that the APA protects against agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." ECF No. 22, p. 25 (citing 5 U.S.C. § 706(2)(A); *Bennet v. Spear,* 520 U.S. 154 (1997)). They further agree that, in the context of the Commission's parole decision, review is limited "only [to] whether the Commission's action violated an explicit requirement of its regulation." *Id.* Because the Commission did not violate its own regulations, the Respondents contend that no violation of the APA is viable. *Id.*

The Court disagrees. As was determined *supra.,* the record establishes that parole was not reopened (and eventually rescinded) in Rodgers' case based on any new information. Instead, the Commission reopened the matter at the behest of Ms. McNeil, the victim's mother. As stated before, nothing in this opinion should be read as diminishing the horrific impact Christian McNeil's death had on his mother, other family members, and friends. But the Commission's own regulations stipulate that it may reopen, and consequently rescind, parole based on a presentation of "new and significant information" – not on victim impact testimony that had been previously offered and was available at two prior hearings. In so doing, the Commission ignored its own rules, thereby violating the provisions of the APA.

VIII.    Conclusion

Fundamentally, the Commission must follow its own regulations, which have the force of law. *Wilson,* 193 F.3d at 200 (citing *United States ex rel Farese v. Luther,* 953 F.2d 49, 52 (3d Cir.1992);

28

*Marshall v. Lansing*, 839 F.2d 933, 943 (3d Cir. 1988)). The Court is convinced that its failure to do so in this case denied Rodgers his rights under Constitution and the APA. Therefore, the Petition for Writ of Habeas Corpus is granted.

IX.    Order

The Commission is hereby ordered to implement an appropriate release plan for Rodgers and to release him pursuant to that plan as soon as practicable, but in no event later than forty-five (45) days of the date of this order.[11]

Ordered and entered this 19th day of March, 2020.

RICHARD A. LANZILLO
United States Magistrate Judge

---

[11] The Court is allowing forty-five (45) days for compliance solely to accommodate possible unavoidable delays due to disruptions associated with the COVID-19 national emergency. The Court expects the Commission to use all reasonable efforts to comply with this order as soon as practicable.